FIRST NATIONAL BANK OF DAVID CITY v. CHARLES H. SARGEANT.

FILED JULY 22, 1902. No. 11,912.

1. **Pleadings: Issue: Evidence: Finding: Fact: Existence: Assumption: Instruction: Error.** Where the pleadings raise an issue of fact, and under the evidence but one finding can be justified, it is not error for the trial court to assume the existence of the fact so established, and instruct the jury accordingly.

2. **Mortgage**: Deed Absolute: Form: Security: Security for Debt: Agreement of Parties. A deed absolute in form will be treated as a mortgage when it is given to secure payment of a debt, although the parties may have agreed that upon default of payment the deed should become absolute. *State Bank of O'Neill v. Mathews*, 45 Nebr., 659.

3. **Duress**: Instruction. Instruction copied in the opinion as to what constitutes duress examined, and *held* the giving thereof not erroneous.

4. **Petition**: Evidence. Petition examined, and *held* to state a cause of action, and evidence *held* sufficient to support the verdict of the jury.

5. **Mortgage**: Deed: Form: Security of Debt: Payment of Excess: Duress: Recovery of Excess. One S. had conveyed, by a warranty deed absolute in form, to a bank certain real estate as security for an indebtedness owing by S. to the bank. S. was in financial distress, and had no means of meeting his indebtedness save by a sale of the real estate. The bank thereafter assumed to be the absolute owner of the property and denied to S. any right, interest or equity therein, and by injunction proceedings undertook to dispossess him of a portion of such land. S. procured a purchaser at an advantageous price, and endeavored to adjust his differences with the bank, so as to effectuate a sale of the property, and meet pressing demands against him. The bank refused to consent to a sale or release its interest or reconvey the premises to S., so that a sale might be consummated without the payment by S. of a large sum of money in excess of the amount justly due. *Held*, Under the facts and circumstances as disclosed by the record, that the payment of the excess over and above the amount justly due was made under duress and compulsion, and might be recovered back in an action brought for that purpose.

6. **Written Agreement**: Compromise: Evidence. At the time of making the arrangements for the payment of the sum demanded, a written agreement was entered into in the nature of a compromise or settlement of the differences existing between the parties, which was accepted and acquiesced in by S. so as to regain control of the land, be able to effectuate a sale of the property, and extricate himself from his financial difficulties. *Held*, That the jury was justified, under the evidence, in finding that the agreement was vitiated, because of duress, for the same reason and to the same extent as the overpayment was the result of legal duress.

7. **Instructions**: Substance of Pleadings: Issues of Fact: Error. Instructions of the court in stating the substance of the pleadings and the issues of fact to the jury examined, and found

that the issues were submitted fairly to both parties, and that no error was committed by such instructions.

8. **Other Errors.** Other alleged errors examined, and found to be without merit.

ERROR from the district court for Butler county. Tried below before SORNBORGER, J. *Affirmed.*

*Matt Miller* and *Arthur J. Evans,* for plaintiff in error.

*A. M. Walling* and *W. M. Cain, contra.*

HOLCOMB, J.

An action was brought in the lower court by the plaintiff, who is now the defendant in error, against the defendant, plaintiff in error, to recover a sum of money alleged to have been paid under compulsion and duress. The trial resulted in a verdict and judgment in favor of the plaintiff for the sum of $640. The defendant prosecutes error.

The petition in error contains 112 assignments of error. With the thermometer registering well up to the same mark, we can scarcely be expected to note and consider each assignment at length, and in detail. If we generalize in our treatment and discussion of the case it is for the sake of brevity, and not because of a lack of investigation and consideration of each and every question presented in briefs of counsel. There are, as it appears to us, a few questions of a controlling character, which, when considered and disposed of properly, must determine the whole case as presented by the record. The controversy arises out of a transaction wherein the defendant by warranty deed obtained the legal title to 154 acres of land theretofore belonging to the plaintiff, and one of the controverted questions is whether by the transaction referred to the defendant obtained the absolute title and ownership of the said real estate, or whether it held the conveyance as security only by way of mortgage. The plaintiff's action is

grounded on the theory that, although a deed absolute on its face, the instrument was but a mortgage, and that in the adjustment and payment of the amount due thereunder the defendant, by reason of the circumstances then surrounding the parties and the relations existing between them, by threats and duress extorted from the plaintiff a much larger sum than was actually due on such indebtedness. The defendant denied that it held the deed as a mortgage, and alleged that it had become the absolute owner of the property by such conveyance, and it also pleaded as a defense that by way of compromise and settlement the parties had adjusted their differences, and that such settlement so made was a bar to any recovery on the cause of action pleaded in plaintiff's petition. On the submission of the cause to the jury, the court assumed and by an instruction told the jury that the deed by which the defendant acquired title to the property, and under which it claimed to be the owner of the real estate, although absolute in form, was in fact a mortgage to secure an indebtedness owing by the plaintiff to the defendant. The giving of this instruction is assigned as error, it being the contention of the defendant that whether or not the deed was to be regarded as an absolute conveyance or only intended as a mortgage was, under the issues and the evidence, a question of fact to be determined by the jury, and that the court could not properly withdraw such question from the jury as triers of fact. If there was any evidence upon which a finding that the defendant acquired the absolute ownership of the property by means of the conveyance could be sustained, then we apprehend the question ought to have been submitted to the jury as contended for. It appears from the record that prior to the execution of the deed, the plaintiff was indebted to the defendant, a national bank, for some $600 or $700, and to secure such indebtedness had executed a second mortgage on the real estate over which the controversy arose. A first mortgage to secure the sum of $2,500 for a loan made thereon was held by a third party at the time the defendant obtained

its second mortgage, and about the 1st of January, 1897, and shortly before the deed in controversy was executed, default having been made in the payment of interest due on the first mortgage, and also taxes assessed against the land, foreclosure proceedings were about to be instituted by the owner thereof. To protect its own interest as second mortgagee the bank, on learning of the prospective foreclosure proceedings on the first mortgage, was anxious that the plaintiff should take some action which would forestall any further proceedings looking toward a foreclosure of the first mortgage. The plaintiff found himself unable to pay the defaulted interest and the back taxes upon the payment of which it appears the first mortgagee was willing to allow the principal to run until some future time. This condition of affairs existed for some little time, and after considerable negotiations it was agreed between the plaintiff and defendant that the bank should pay the back interest due on the first mortgage and taxes past due, and agree to pay the principal sum on the first of January following, cancel its own indebtedness, and the second mortgage securing the same, the total of the indebtedness and costs aggregating $3,830.67, and that the plaintiff would execute a warranty deed for the real estate covered by the two mortgages mentioned. At the time of the execution of the deed to the bank, it executed back to the plaintiff a formal lease of the premises for the year 1897, and also a formal contract of sale, agreeing to reconvey the premises upon the payment of the said sum of $3,830.67 on or before January 1, 1898, with interest thereon at ten per cent. per annum after the last-mentioned date. The plaintiff testifies, in substance, that the deed was given and accepted as a mortgage only, while the president of the bank says it was an absolute conveyance, and that the bank became the purchaser outright of the land by virtue of such conveyance. The negotiations leading up to the execution of the deed and the accompanying instruments appear to have been by correspondence, the letters of the bank relating to the matter being introduced in evidence. We look

in vain for any act or words of the parties outside of the formal documents they at the time executed, evidencing an intention on the part of the plaintiff to sell the land and the bank to become the purchaser thereof by the execution and delivery of the deed of conveyance. We think the language and the conduct of the officers of the bank negative the idea that it was at the time purchasing the property or accepted the conveyance otherwise than as security for its indebtedness owing by the plaintiff and the advancements made and to be made by it on the first mortgage. No other consideration entered into the transaction, and by its own testimony we think it is firmly established that the conveyance, although an unconditional warranty deed, was in fact and in contemplation of law but a mortgage to secure the plaintiff's indebtedness secured by the two mortgages hereinbefore referred to. In urging the plaintiff to take some action regarding the matter, it is stated by the president of the bank in one of his letters to him: "It is quite important to us to have this loan [the first mortgage] reinstated now, as it will leave the interest at six per cent. instead of nine per cent. or ten per cent., and save costs. We do not wish to take up the $2,500 now either. The only way I can see out, is for you now to deed over your land to the bank, and then we can advance the back interest and get it reinstated. As soon as you can arrange the loan or money, we are perfectly willing to deed it back to you. It is understood that this is merely a temporary arrangement, and that you proceed with your efforts to make other arrangements to redeem the land." In another letter, after giving the items going to make up the aggregate sum due, including taxes and costs, the president of the bank writes as follows: "The transfer and sale would necessarily have to be understood to be absolute, and not in the nature of a trust or mortgage, and all rights vested in the bank or its trustee, in order to enable the bank to acquire and carry this load for a year. During the year, ending January 1, 1898, you could pay off the purchase money from time to time and buy it back." And again, in

a letter of later date urging the plaintiff to execute the deed and close up the transaction, the president of the bank writes: "I can not see anything to be gained by longer delay to sign and forward the deed at once, to settle this matter. If Mr. Dodge, or some other good friend, should send you the money, to redeem or buy back, the bank is ready to deed over the land in an hour's notice on payment of the cash." Nowhere is it suggested that the bank by the transaction is becoming the purchaser unconditionally of the land, or that the plaintiff is losing his entire interest and the equity of redemption therein. It is manifest, we think, that the conveyance was executed by the plaintiff solely as security, and that the defendant so understood and accepted it on its delivery to the officers of the bank. The formal lease executed at the time as a part of the same transaction and the contract to resell the land to the plaintiff but confirms him in his contention that the deed was in reality a mortgage, and that his right of redemption was preserved to him. Evidently what the parties tried to accomplish was to execute a conveyance that would operate as security for the indebtedness owing by the plaintiff, preserving to the grantor the right to redeem at any time, upon payment of the mortgage debt, before January 1, 1898, after which, if redemption was not effectuated, the deed should become absolute; but as is said in *Bank of O'Neill v. Mathews*, 45 Nebr., 659, a deed so executed and delivered must be treated as a mortgage notwithstanding such an agreement. Says Commissioner IRVINE, who wrote the opinion: "This was the understanding and is the legal effect of all mortgages, and the whole doctrine of foreclosure and redemption arose from courts of equity relieving against this understanding and its legal effect." It is, therefore, we think, clear that the deed in question must be taken and held to be a mortgage only, and not susceptible of any other construction, and that the trial court did not err in treating and assuming in its instruction to the jury that the instrument was a mortgage, and not an absolute conveyance.

On the question of what is required to constitute duress the court instructed the jury as follows: "Duress may be defined as an unlawful restraint, intimidation or compulsion of another to such an extent and degree as to induce such other person to do or perform some act, which he is not legally bound to do, contrary to his will and inclination." This instruction is complained of as erroneous. It is said that the instruction should have told the jury that the will must be "overpowered," or the injured party "bereft of the quality of mind essential to the making of a contract." We think, under the issues and the character of the duress complained of, the instruction is a fair presentation of the meaning of the word, and that no error was committed such as is, complained of. "Duress," it is said, "exists when one, by the unlawful act of another, is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will." *Hackley v. Headley,* 45 Mich., 569. It is obvious that if the act is done contrary to the will and inclination of the injured party, it can not be the exercise of his free will. His will is subjected to that of another, and he is compelled to yield and submit to an illegal exaction because of the dominant power. In *Parmentier v. Pater,* 13 Ore., 121, it is said that to constitute duress by threats "it is sufficient that they do in fact compel the person threatened to do an act which otherwise he would not have done." Ordinarily it may be said duress is that degree of constraint or danger either actually inflicted or threatened and impending, sufficient to overcome the mind and will of a person of ordinary firmness. *Brown v. Pierce,* 7 Wall. [U. S.] 205, 214, 19 L. Ed., 134, 136; *Baker v. Morton,* 12 Wall. [U. S.], 150, 157, 20 L. Ed., 262, 264; *French v. Shoemaker,* 14 Wall. [U. S.], 314, 332, 20 L. Ed., 852, 856; *United States v. Huckabee,* 16 Wall. [U. S.], 414, 431, 21 L. Ed., 457, 463; 1 Chitty, Contracts [11th Am. ed.], 269; 2 Greenleaf, Evidence, secs. 301, 302; 1 Wharton, Contracts, ch. 8, sec. 144; 2 Wharton, Evidence, secs. 931, 1099; 1 Story, Equity Jurisprudence, sec. 239; 2 Pomeroy,

Equity Jurisprudence, sec. 950.   The instruction comes fairly within the rule, and the exception thereto is not well taken.

It is also contended that the petition does not state facts sufficient to constitute a cause of action, and that the evidence will not support the verdict returned by the jury. These two questions may be considered together.   The petition charges that the plaintiff was in great financial distress and in poor health, both in body and mind; that after the defendant had obtained a deed of the premises under the circumstances narrated, and as security for the debt owing by the plaintiff, who had reposed trust and confidence in the officers of the bank by giving to them a deed absolute on its face when only security was intended, such officers soon thereafter began to assume to be the absolute owners of the property, and to have the right of possession and control thereof, and began a systematic effort to dispossess the plaintiff and compel him to acknowledge the bank as the absolute owner, and that in the controversy as to the right of possession the defendant brought an injunction suit to restrain the plaintiff from holding possession of said premises or a part thereof, and denied any and all rights of the plaintiff in and to the premises; that the plaintiff was heavily in debt, without means to meet the same, save by a sale of the land, which he was endeavoring to effectuate; that in the spring of 1898 he obtained a purchaser for the real estate at an advantageous price, and thereupon endeavored to obtain an adjustment of the indebtedness due the defendant, and to have the same paid out of the purchase price to be obtained by the proposed sale of said real estate; that the defendant demanded several hundred dollars more than was due; denied that the plaintiff had any interest in the land and refused to consent to its sale or to relinquish its title to the property or join in a conveyance unless paid the exorbitant sum so demanded; that it was near springtime, when farming operations begin, and the purchaser threatened to withdraw his bid unless the sale should soon be consummated;

that the defendant refused to make any statement of the items comprising the indebtedness it claimed to be due it, or to give any reason why such sum as demanded was due, and threatened to appeal the suit then pending to the court of last resort, if the judgment obtained in the trial court was not satisfactory, where it would probably remain undisposed of for several years, and in the meantime the plaintiff would be compelled to pay a high rate of interest on such indebtedness as well as the costs and expenses of litigation; that the plaintiff was unable to meet his indebtedness without resort to a sale of the property mortgaged, and that the sale could not be effectuated without a compliance with the demands of the defendant as to the payment of the sum it claimed to be due, and that thereupon the plaintiff, after the defendant had reduced its demand in a small amount from the total sum first claimed, involuntarily and by compulsion paid the same in order to effectuate a sale of the property and relieve himself from the financial distress he was then suffering; that the over-payment to recover which the suit was brought was paid under compulsion and duress, and not of plaintiff's free will. The evidence fairly substantiates the allegations of the petition. The duress complained of rests, we apprehend, in the unfortunate financial condition in which the plaintiff found himself, coupled with the control over the legal title to the land and apparent ownership thereof which the bank had acquired, and its power to prevent a voluntary disposal by the plaintiff to meet his just indebtedness without first obtaining the consent of the bank and complying with such demands as it might impose as a condition of releasing its interest and title to the property. The duress relied on as grounds of relief, if existing, consisted not so much in threats against the defendant or duress of his person, as it did in a wrongful and unjust exercise of control and ownership of the property of the plaintiff, being the real estate to which it held the legal title; and apparently the right of disposal on any terms it saw fit to impose, or of withholding the land from

sale altogether, until compelled to act by a final decree in a proper suit brought to try and determine the rights of the respective parties. The case is one of duress of the property of an individual rather than duress of his person. The ancient doctrine of duress applied only to duress of the person, such as amounted to a reasonable apprehension of imminent danger to life, limb or liberty, which was in law deemed sufficient to avoid a contract or enable the injured party to recover back money when so paid. The law, however, has progressed and gradually extended the doctrine so as to recognize duress of property as a species of moral duress which might equally with duress of the person constitute a defense to a contract induced thereby, or entitle a party to recover money paid under its influence. The rule is that when such pressure or constraint is brought to bear as will compel a man to go against his will, and takes away his free agency, destroying the power of refusing to comply with the unjust demand of another, this will constitute legal duress, regardless of manifestations or apprehension of physical force.

It is held in *Joannin v. Ogilvie*,[*] 52 N. W. Rep. [Minn.], 217: "There may be duress with respect to real property as well as personal, so as to render a payment on account of it involuntary, so that the money may be recovered back." In that case it appears a mechanic's lien was filed against property upon an unfounded claim which the owner paid under protest in order to clear the title of record so that he might consummate a loan on the property which he had negotiated in order to raise money to pay a prior overdue mortgage and other pressing debts, he having no other available means of raising the money. The payment under the circumstances was held to be in consequence of duress of property, and that an action would lie for its recovery. Says the author of the opinion: "He was so situated that he could neither go backward nor forward. He had practically no choice but to submit to plaintiffs' demand. Had it been goods and chattels which plaintiffs

[*]16 L. R. A., 376, 32 Am. St. Rep., 581.

had withheld under like circumstances, there would be no doubt, under the doctrine of *Fargusson v. Winslow*, 34 Minn., 384, 25 N. W. Rep., 942, but that the payment would be held to have been made under duress. But while filing the lien did not interfere with defendant's possession of the land, yet it as effectually deprived him of the use of it for the purposes for which he needed it as would withholding the possession of chattel property. It has been sometimes said that there can be no such thing as duress with respect to real property, so as to render a payment of money on account of it involuntary. But this is not sustained by either principle or authority. In view of the immovable character of real property, duress with respect to it is not likely to occur as often as with respect to goods and chattels. But the question in all cases is, was the payment voluntary? and for the purpose of determining that question there is no difference whether the duress be of goods and chattels, or of real property, or of the person. *Fraser v. Pendlebury*, 31 Law J. Com. Pl. [Com. Law], 1; *Pemberton v. Williams*, 87 Ill., 15; *Close v. Phipps*, 7 Man. & G. [Eng.], 586; *White v. Heylman*, 34 Pa., 142; *State v. Nelson*, 41 Minn., 25." These remarks are very pertinent, and apply with equal force to the situation of the plaintiff in the case at bar.

Another case, which seems apropos to the one at bar, decided by the supreme court of Wisconsin, is *Guetzkow Bros. Co. v. Breese*,\* 72 N. W. Rep., 45. In that case a lessor refused to join his lessee in executing proofs of loss after fire had destroyed the leased property and indorse drafts payable to them jointly unless the lessee paid him a sum of money he did not owe. The condition of the lessee's business was such that he was compelled to have the insurance money without prolonged delay, and he thereupon paid the lessor his unlawful exaction. Afterwards the lessee brought suit to recover the money thus paid as having been paid under duress, recovered judgment, and the action was sustained.

\*65 Am. St. Rep., 83.

The authorities are abundant to the effect that where goods or other property is in possession of one not the owner, who refuses to deliver such property to the owner unless the latter pays him a sum not rightfully due, and the owner in order to obtain possession of his property pays the unlawful exaction, a payment so made is in a legal sense under duress and may be recovered back in a proper action, and especially is such the case where the wrongful detention is connected with circumstances of hardship or serious inconvenience to the owner. *Chase v. Dwinal,** 7 Me., 134; *Mays v. City of Cincinnati,* 1 Ohio St., 268; *Adams v. Schiffer,* 17 Pac. Rep. [Colo.], 21; *Chamberlain v. Reed,*† 13 Me., 357; *White v. Heylman,* 34 Pa. St., 142; *Crawford v. Cato,* 22 Ga., 594; *Central Bank of Frederick v. Copeland,*‡ 18 Md., 305; *Scholey v. Mumford,* 60 N. Y., 498.

In a very early case (*Astley v. Reynolds,* reported in 2 Strange [Eng.], 915) the plaintiff pawned plate to the defendant as a pledge for the payment of a sum of money loaned. When desiring to redeem, the defendant demanded and was paid a large sum of money in excess of the amount loaned, with legal interest. Suit was brought to recover the surplus above legal interest. The court of king's bench says: "We think, also, that this is a payment by compulsion; the plaintiff might have such an immediate want of his goods, that an action of trover would not do his business; where the rule *volenti non fit injuria* is applied, it must be where the party had his freedom of exercising his will, which this man had not; we must take it he paid the money relying on his legal remedy to get it back."

In other cases it is said, in order to constitute duress, "there must be some actual or threatened exercise of power possessed, or supposed to be possessed, by the party exacting or receiving the payment, over the person or property of the party making the payment, from which the latter has no other means of immediate relief than by advancing

*20 Am. Dec., 352.   †29 Am. Dec., 506.   ‡81 Am. Dec., 597.

the money." *Brumagim v. Tillinghast*, 18 Cal., 265; *Radich v. Hutchins*, 95 U. S., 210.

In 6 Am. & Eng. Ency. Law, p. 84, with respect to the relations existing between mortgagees and mortgagors, the rule as to payment under duress is stated as follows: "If a mortgagee of land, who is in possession for conditions broken, require that the mortgagor or his assignee pay more than is legally due, in order to redeem, and it is paid accordingly, for the purpose of preventing a foreclosure, it is such a compulsory payment as entitles the party who so pays to recover it back." In support of the text is cited *Cazenove v. Cutler*, 4 Met. [Mass.], 246; *Fraser v. Pendlebury*, 31 Law J. Com. Pl., 1; *Bennett v. Healey*, 6 Minn., 240 [Gil. 158]; *Freeman v. Etter*, 21 Minn., 3; *McMurtrie v. Keenan*, 109 Mass., 185.

The evidence in the case at bar fairly supports the contention of the plaintiff that he was without redress or remedy and was compelled to submit to the exactions of the defendant or lose a voluntary sale of his property at advantageous figures. It appears that he was utterly unable to meet his obligations save by a sale of the property to which defendant held the legal title, and that unless the sale was consummated at about the time the terms of sale were agreed upon he would not only lose the opportunity of selling to the prospective purchaser, but probably also to other buyers, because farming operations for the coming year were then due to begin, and arrangements for the year's work must be made accordingly. With the title in litigation, and with the threat of the defendant to keep it so for years to come, unless its terms were acceded to, and with the large indebtedness standing against the land, drawing interest from January preceding at the highest rate allowed by law, we can readily appreciate how the plaintiff's mind was overpowered, and the payment exacted made in order to meet pressing demands, and save, if possible, the little remaining equity which he held in the property, as well as to prevent payment of costs incidental to long-continued litigation, accumulating interest,

and impending deficiency judgments. The evidence, we are satisfied under the principles announced and the authorities cited, was sufficient to justify the jury in finding that the payment was under the circumstances involuntary and under duress.

We are of the opinion that the compromise and settlement pleaded as a defense was but a part of the transaction constituting duress on the part of the defendant; that the same facts which would justify a recovery of the overpayment as being made under duress must for the same reason annul and render valueless the alleged settlement as a compromise of honest differences. The defendant had undertaken by an injunction suit to restrain the plaintiff from enjoying the use and possession of the real estate in controversy. Plaintiff had answered in that action, pleading that the defendant's conveyance, through which it claimed, though an absolute deed in form, was in fact but a mortgage to secure an indebtedness owing by him to the bank, and asked to have an accounting of the amount due, and that the deed be declared a mortgage securing the same in conformity with the facts and intention of the parties. This suit was pending at the time of the alleged settlement. It is to be borne in mind that the case is entirely different from one in which the indebtedness is fixed and certain, and evidenced by written instruments secured by a mortgage in form as well as in fact. In the case at bar the plaintiff was completely at the mercy of the defendant. He could make no disposition of his property until his differences with the defendant were adjusted in some form. He could not dispose of his equity of redemption, since this interest and right was denied, and but few care to buy a lawsuit with the purchase of property. He could not allow the matter to run the ordinary course of litigation without losing all his equity in the land and facing a probable deficiency judgment. He could not pay costs of litigation and the increased interest on the indebtedness for any length of time without the whole property being swallowed up. He was met with the threat that unless the differences

were settled on the terms offered by the bank, the litigation would be continued, and in the event of an unsatisfactory judgment in the trial court, the cause would be appealed there, to take its course with the accumulated litigation then pending in the appellate court awaiting final disposition. This meant a delay of years, as the plaintiff well knew. He must have been cognizant of the fact, as all well-informed men are, that should the matter be litigated, and the property finally exposed to forced sale to satisfy the indebtedness admittedly existing against it, that the sum thus realized would not be at all as favorable to him as would be the result in the event of a voluntary sale and a voluntary purchaser. It was under these circumstances, and because an immediate sale of the property was necessary to immediately relieve him from his financial distress, that the agreement was executed by his son as attorney in fact, and afterwards ratified and acquiesced in by the plaintiff in finally consummating the sale of the property, and paying out of the proceeds thereof the demands of the defendant. The overpayment was an unlawful and unjust demand, and this is practically conceded. If the defendant had only a mortgage on the land, as has been held, then it could not justly require of the plaintiff the payment of more than its indebtedness, with costs and lawfully accrued interest. But it was not satisfied to accept what was justly due, and because of the peculiar situation of the parties, the plaintiff acceded to its demands, agreed to the terms of settlement evidenced by the agreement pleaded as a settlement and compromise, and paid the money demanded, and which it is alleged was an overpayment and made under compulsion. Duress, like fraud, vitiates all contracts, and the contract of settlement was the result of duress, as much so as the overpayment made thereunder which it is sought to recover. The contract simply provides that upon the payment of all costs in the injunction proceeding, and the payment to the defendant of the amount it demanded after reducing the original sum claimed $125, and a certain judgment obtained against the plaintiff, that

46

it would quitclaim its interest in the property to the plaintiff, thereby permitting him to consummate a sale thereof. The jury found under the instructions given that this contract, as well as the payment of the excess demanded by defendant according to its terms, was the result of duress and compulsion, and the evidence relating to the matter is, we think, sufficient to sustain the finding. Therefore the defense thus interposed to the plaintiff's cause of action must fail.

Some complaint is made because of the manner of stating the issues in the court's instructions to the jury, but on examination we are satisfied that the statement of the substance of the pleadings in the instructions was fair to both parties, and that no error was committed in that regard.

Several other alleged errors are argued which are found to be without merit. The instructions appear to have fairly submitted all issues of fact to the jury, were without prejudice to the losing party, and the verdict, we are of the opinion, should be permitted to stand. The petition states a cause of action, and the verdict is supported by the evidence. The judgment is accordingly

AFFIRMED.

NOTE.—*Mortgage.*—*Origin.*—*Farm.*—*Shylock's Bond.*—"The notion of mortgaging and redemption seems to be of Jewish extraction, and from the Jews derived to the Greeks and Romans."—Bacon, Abridgment, 27. Mortgages had become common in the time of Henry VI. and Edward IV. Mr. Donell [Donnell?] ascribes their origin to the Jews. *Kyger v. Ryley*, 2 Nebr., 20, 23. A mortgage of real property may be created by any form of absolute conveyance. 20 Am. & Eng. Ency. Law [2d ed.], p. 903.

*Shylock v. Antonio.*—The original case was a suit of Shylock against Antonio, upon a bond for the payment of three thousand ducats or a pound of flesh, but a conversion by the court to a criminal proceeding, with penalty of forfeiture to the state, made it a state case. The judgment stands, mocking all principles of law, making the judiciary a juggle, perverting the public morals, making opprobrious metaphor an easement to the conscience for breach of contracts, and fostering a cruel religious prejudice. * * * As to the law points, both the counsel for the defendant and the court admitted that the contract was lawful. Counsel did not even plead that it was against public policy; which is a handy law to let corporations out of their contracts; like as the vague phrase that

an act is a police regulation is a way of driving it through the constitution. 11 American Law Record, p. 641.

*Quære.*—If Francis Bacon had written "The Merchant of Venice" would he have made such mistakes?—W. F. B.