[No. 2472]

## LEVI F. HOSTETLER, RESPONDENT v. J. C. HARRIS, SHERIFF OF ELKO COUNTY, NEVADA, APPELLANT.

[197 Pac. 697]

1. COURTS—RULING OF FEDERAL COURT CONSTRUING FEDERAL CONSTITUTION CONTROLLING.

Rulings of the United States Supreme Court construing the provisions of the federal constitution are controlling upon the state courts.

2. CONSTITUTIONAL LAW—PUBLIC LANDS—STATUTE PROVIDING FOR PAYMENT OF LICENSE FEE FOR GRAZING CATTLE HELD AN UNLAWFUL DISCRIMINATION AGAINST CITIZENS OF OTHER STATES.

Stats. 1919, c. 214, sec. 1, requiring persons grazing cattle in the state who do not have their principal home ranch and livestock headquarters in the state to pay a license, violates Const. U. S. art 4, sec. 2, providing that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.

3. PUBLIC LANDS—STOCK MAY BE DRIVEN INTO THE STATE TO GRAZE.

A resident of a foreign state has a perfect right to drive his sheep into the state and graze them upon the public lands, a right guaranteed to him by the supreme law of the land.

4. LICENSES — LICENSE MONEY FOR PASTURAGE UNLAWFULLY DEMANDED HELD NOT PAID · VOLUNTARILY.

In an action to recover license money paid for grazing stock on public lands in the state under Stats. 1919, c. 214, sec. 1, under threat of arrest and prosecution, *held*, that the payment was not voluntary; plaintiff having paid the same under protest, and being a resident of a foreign state.

APPEAL from Fourth Judicial District Court, Elko County; *E. J. L. Taber,* Judge.

Action by Levi F. Hostetler against J. C. Harris, Sheriff of Elko County. From a judgment for plaintiff

and an order denying his motion for a new trial, defendant appeals. **Affirmed.**

*H. U. Castle,* District Attorney, for Appellant:

The decision of the lower court should be reversed. The amendatory act of the legislature in question is constitutional. The payments made by respondent were voluntary and cannot be recovered back.

"The power of the legislature to impose taxes on persons, property, business, and franchises is unlimited, save only by such restrictions as are found in the organic law, state or federal, or such as are inherent in the nature of the subject itself. This power rests in the sound discretion of the legislature." 17 R. C. L. 501.

Occupations are classified on an almost unlimited variety of grounds. "A state may make discriminations, if founded on distinctions that cannot be pronounced unreasonable and purely arbitrary; and pursuant to this general authority, it may adjust its revenue laws and taxing system in such a way as to favor certain industries or forms of industry." Idem, 516.

The act is not discriminatory. All persons subject to its terms are treated alike under like circumstances and conditions; and even so, there is authority that recognizes the right of the state under certain circumstances to classify residents and nonresidents. 6 R. C. L. 416; 12 R. C. L. 693; De Grazier v. Stephens, 16 L. R. A. (N.S.) 1033.

"It does not appear that the act is more favorable to citizens of this state than to those of our sister states. * * * Such an act does not violate either the letter or the spirit of the federal constitution." Ex Parte Goddard, 190 Pac. 916; Reid v. Colorado, 47 L. Ed. 108.

The money was paid voluntarily; it cannot be recovered. "Money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back on the ground that the claim was illegal, or that there

was no liability to pay in the first instance, though the payer makes the payment expressly reserving his right to litigate his claim, or under the impression that the demand was legal." 21 R. C. L. 141.

The payment would be voluntary if the demand could be enforced only by an action at law. Respondent would have had his day in court if he had been charged with a misdemeanor under the statute for failing to pay the license, and the invalidity of the law which authorized the collection of the license would have been a perfect defense. Maxwell v. County, 12 Pac. 484; Benson v. Monroe, 7 Cush. 125; Muscatine v. Keokuk, 45 Iowa, 185; Oceanic S. N. Co. v. Tappah, 16 Blatchf. 296; Trower v. S. F., 92 Pac. 1025; Greene v. Taylor, 212 S. W. 925; Bean v. Middleboro, 22 Ky. L. R. 415. "In the case under consideration, the plaintiff paid the money with a full knowledge of all the facts and circumstances, and well knowing that there was no legal obligation to pay it. It must, therefore, be regarded as a voluntary payment, and not a payment under duress." Claflin v. McDonough, 33 Mo. 412.

*Turner K. Hackman,* for Respondent:

The statute here complained of creates an arbitrary classification, and is, therefore, void, as in conflict with the fourteenth amendment to the constitution of the United States. It discriminates between persons engaged in the same industry. "It is the duty of the courts to be watchful for the constitutional rights of a citizen and against any stealthy encroachments thereon." Boyd v. United States, 16 U. S. 616.

While it is true that the power of classification cannot be withheld from the states, it is equally true that such classification cannot be made arbitrarily. Hayes v. Missouri, 120 U. S. 68; Railroad v. Mackey, 127 U. S. 205; Walston v. Nevin, 128 U. S. 578. While a large discretion as to the power of the state to classify for the purposes of taxation must be conceded, the fact that

there is a limit to such discretion must be recognized. Bell's Gap R. Co. v. Pennsylvania, 134 U. S. 232.

Arbitrary selection can never be justified by calling it classification. The equal protection demanded by the fourteenth amendment forbids this. Yick Wo v. Hopkins, 118 U. S. 356. Nor can it be permitted that litigants shall be debarred from the free exercise of constitutional rights by the imposition of arbitrary, unjust and odious discrimination, perpetrated under color of establishing peculiar rules for a particular occupation. Gulf, C. & S. F. Ry. Co. v. Ellis, 41 L. Ed. 636.

Though the law itself be fair on its face and impartial in appearance, if it is applied and administered by public authorities so as practically to make unjust and illegal discrimination between persons in similar circumstances, material to their rights, denial of equal justice is still within the prohibition of the constitution. Henderson v. Mayor, 92 U. S. 259; Chy Lung v. Freeman, 92 U. S. 275; Buneal v. Delaware, 103 U. S. 370. "The discrimination is therefore illegal, and the public administration which enforces it is a denial of the equal protection of the law and a violation of the fourteenth amendment to the constitution." Yick Wo v. Hopkins, 118 U. S. 356.

"Whatever policy may be the result of this current agitation can have no effect upon the present case, as the law of Utah and its customs in this regard remain such as we have described it to be in the general region of the northwest, and the privileges accorded by the United States for grazing upon her public lands are subject alone to their control." Buford v. Houtz, 33 L. Ed. 620; Hill v. District of Columbia, 7 Mackey, 481; Harvey v. Olney, 42 Ill. 336; Home T. & T. Co. v. City, 181 Pac. 100; Magnolia v. Sharman, 46 Ark. 358.

The payment was involuntary, and a recovery can be had. W. F. & Co. v. Dayton, 11 Nev. 161; Harmon v. City of Chicago, 147 U. S. 396. "Taxes illegally assessed

and paid may always be recovered back, if the collector understands from the payer that the taxes are regarded as illegal and that suit will be instituted to refund the paying of them." Erskine v. Van Arsdale, 15 Wall. 75; Shoup v. Willis, 2 Idaho, 120; Winzer .v. Burlington, 68 Iowa, 283; Lyon v. Receiver, 52 Mich. 276; Vicksburg v. Butler, 56 Miss. 74; Turner v. Alpheus, 6 Nev. 67; Dunnell Mfg. Co. v. Newell, 15 R. I. 258, 2 Atl. 770.

By the Court, COLEMAN, J.:

Respondent, a citizen and resident of the State of Idaho, brought this action to recover $952 from the defendant, as sheriff of Elko County, Nevada. The sheriff has appealed from a judgment for said amount and from an order denying a motion for a new trial.

Respondent drove into Elko County, Nevada, from Idaho, without having first obtained a license therefor, 1,900 head of sheep, of which he was the owner, for the purpose of grazing them upon uninclosed public lands. Appellant threatened to arrest and prosecute him upon a charge of misdemeanor, unless he made payment to him of a grazing license. Thereupon respondent paid to appellant, under protest, the sum of $952 for such grazing license. Section 1, c. 214, Statutes of 1919, under and pursuant to which the sheriff acted, so far as material, reads as follows:

"It shall be unlawful for any person * * * who * * * does not have his * * * principal home ranch and livestock headquarters in the State of Nevada, except as herein provided, to herd or graze, or cause to be herded or grazed, upon any unenclosed lands in the State of Nevada, any sheep or bovine cattle without having first obtained from the sheriff of a county in which such herding or grazing, or some portion thereof is done, a valid license authorizing such herding and grazing in the State of Nevada. Such license shall be issued by said sheriff to and in the name of such person or corporation upon compliance by him or it with the

provisions of section 2 of this act and shall be valid only for the calendar year in which it is dated; provided, that any person or any corporation which does not have its principal home ranch and livestock headquarters in the State of Nevada, owning in fee simple land in the State of Nevada, shall be exempt from any license or the payment of any license for five (5) head of sheep for each acre so owned and three (3) head of bovine cattle for each acre so owned."

Violation of the act is made a misdemeanor, punishable by a fine of not less than $1,000 or more than $10,000.

The trial court found as a fact:

"That plaintiff paid to said sheriff the sum of $952 as and for said license fee under protest and by reason of the threat of said sheriff to arrest and prosecute said plaintiff as aforesaid."

Two questions are presented in this case: First, is the statute violative of section 2, article 4, of the federal constitution? And, second, if the statute is void, was the payment so involuntary as to justify its recovery?

The section of the constitution mentioned reads:

"The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."

The question is: Does the act in question discriminate against citizens of other states?

The State of Tennessee enacted a statute which provided, inter alia:

"Each foreign construction company, with its chief office outside of this state, operating or doing business in this state, directly or by agent, or by any subletting contract, * * *" shall pay a privilege license of $100.

The act also provided:

"Each domestic construction company and each foreign construction company, having its chief office in this state, doing business in this state, * * *" shall pay a privilege license tax of $250. Laws 1909, c. 479, sec. 4.

The question of the constitutionality of the act came before the supreme court of that state, where the point was made, as here, that the act was unconstitutional because it was discriminatory against citizens of other states. That court held that the act did not discriminate against citizens of sister states; that the determinative feature in the statute is the having of one's chief office in the state. Wright v. Jackson, 138 Tenn. 145, 196 S. W. 488.

The case was taken to the Supreme Court of the United States, and that court took the opposite view and reversed the judgment of the Tennessee court. It said:

"The power of a state to make reasonable and natural classifications for purposes of taxation is clear and not questioned; but neither under form of classification nor otherwise can any state enforce taxing laws which in their practical operation materially abridge or impair the equality of commercial privileges secured by the federal constitution to citizens of the several states.

" 'Excise taxes, it is everywhere conceded, may be imposed by the states, if not in any sense discriminating; but it should not be forgotten that the people of the several states live under one common constitution, which was ordained to establish justice, and which, with the laws of Congress, and the treaties made by the proper authority, is the supreme law of the land; and that that supreme law requires equality of burden, and forbids discrimination in state taxation when the power is applied to the citizens of the other states. Inequality of burden, as well as the want of uniformity in commercial regulations, was one of the grievances of the citizens under the confederation; and the new constitution was adopted, among other things, to remedy those defects in the prior system.' Ward v. Maryland, 12 Wall. 418, 431; Guy v. Baltimore, 100 U. S. 434, 439; Blake v. McClung, 172 U. S. 239, 254; Darnell & Son Co. v. Memphis, 208 U. S. 113, 121.

"As the chief office of an individual is commonly in the state of which he is a citizen, Tennessee citizens

engaged in constructing railroads in that state will ordinarily have their chief offices therein, while citizens of other states so engaged will not. Practically, therefore, the statute under consideration would produce discrimination against citizens of other states by imposing higher charges against them than citizens of Tennessee are required to pay. We can find no adequate basis for taxing individuals according to the location of their chief offices—the classification, we think, is arbitrary and unreasonable. Under the federal constitution a citizen of one state is guaranteed the right to enjoy in all other states equality of commercial privileges with their citizens; but he cannot have his chief office in every one of them." Chalker v. Birmingham & N. W. Ry. Co., 249 U. S. 522, 39 Sup. Ct. 366, 63 L. Ed. 748.

The only argument which can be put forth in support of the constitutionality of the statute here complained of is that the license is not aimed at those who are not citizens of this state, but against those who do not have their principal home ranch and livestock headquarters in the State of Nevada.

1, 2. Whether or not we are disposed to agree with the reasoning of the Supreme Court of the United States as presented in the above quotation is of no consequence, since the ruling is controlling upon us, and it seems that its viewpoint as presented in the quotation is equally as forceful in its application to this case as it was to the case in which it stated the rule. We can see no reason why a more favorable view should be taken in favor of the validity of an act in a case affecting an individual who is engaged in the livestock and sheep business than would be taken in a case affecting a construction company. To paraphrase the interpretative language quoted from the Chalker opinion: As the principal home ranch and livestock headquarters of an individual is commonly in the state of which he is a citizen, Nevada citizens engaged in the livestock business in Nevada will ordinarily have their chief home ranch and livestock headquarters therein, while citizens of other

states so engaged will not. Practically, therefore, the statute under consideration would produce discrimination against citizens of other states by imposing a license tax upon them while imposing none upon citizens of Nevada.

Guided by the ruling in the Chalker case, there is no escaping the conclusion that the act in question is discriminatory against citizens of sister states, and hence is null and void. See, also, State v. Butterfield, 17 Idaho, 441, 106 Pac. 455, 26 L. R. A. (N. S.) 1224, 134 Am. St. Rep. 263.

Was the payment by the plaintiff, which is sought to be recovered, voluntary? Whether or not a payment is voluntary is dependent upon the facts and circumstances of the particular case. A payment made under a particular state of facts by one in poor health, nervous, and excitable, might be involuntary, while the same situation would not have the slightest tendency to overawe a person in excellent physical and mental condition. Likewise, a resident of another state, distant from friends and business associates, and unfamiliar with local situations and influences, in what he may assume to be a hostile community, with large property rights demanding his attention, is more susceptible to threats of criminal prosecution than one who is a resident of a community surrounded by acquaintances and friends, and well knowing that he will not be the victim of an unfriendly sentiment. Likewise, an individual is less likely to be put under duress by a demand for the payment of an unjust claim when insisted upon by a mere citizen—one who is upon an equal footing with him— than when demanded by a public official, accompanied by threat of prosecution for the violation of that which has the sanction of legislative and executive approval of a sovereign state, and back of it all the power, resources, and majesty of such state.

3, 4. Such was the situation in which the plaintiff found himself. As a resident of the sovereign State of Idaho, he had a perfect right to drive his sheep into

Nevada and graze them upon the public lands—a right guaranteed to him by the supreme law of the land. But when he brought his sheep into this state, the sum of $952 was demanded of him under color of law, and he was threatened with being taken from his sheep and prosecuted, with the possibility of having to pay a fine of $10,000 should he refuse the demand. Was not such a situation enough, not only to arouse the anxiety but to disturb the equanimity of respondent? We think it was. Under no circumstances can a case in which payment is unlawfully exacted by a public official be put on a par with one unjustly exacted by a mere citizen. Some authorities have laid it down as a rule that money unlawfully exacted by a public official may be recovered, even though not paid under protest, and such holding is not without strong reasoning to support it. In Stephan v. Daniels, 27 Ohio St. 527, the court says:

"In Steele v. Williams, 8 Exch. 624, it was held that money paid under an illegal demand, colore officii can never be voluntary. It was a case of a public officer demanding greater fees than allowed by act of parliament, which were paid without protest. Martin, B., said: 'As to whether the payment was voluntary, that, in truth, has nothing to do with the case. * * * To call it a voluntary payment is an abuse of language.'"

Another case in which a recovery was allowed, although the payment was not made under protest, is that of City of Chicago v. Waukesha Brew. Co., 97 Ill. App. 583. The court says:

"Upon the trial of this cause it was admitted that the ordinance under which appellee paid $1,500 as license fees to the city was invalid. The evidence showed that such sum was paid, under a demand by police and collection officers sent out by the city to appellee's place of business, and threats by such officers made to appellee that unless the fees demanded were paid, appellee would be prosecuted, its drivers arrested and it get into trouble. And that the officers of appellee paid the various sums

demanded under the influence of such threats and to prevent its employees from being arrested. Payment under such circumstances was payment under duress.

"It must be borne in mind that there is manifest distinction between demand and threats made by a private individual not possessed of any means of enforcing such threats, and payment to governmental authority clothed with power to enforce this demand by immediate arrest, interruption and stoppage of the business of one to whom such threats are made.

"In the present case, the parties did not meet upon equal terms. The alternative presented to appellee was, to submit to the city's exaction or discontinue its business. It was in the power of its officers and obliged to do as they required or cease to carry on business within the city limits. Money paid under such circumstances, in point of law, is not paid voluntarily, any more than that which one hands to a highwayman, under threat of personal violence. Swift Co. v. U. S., 111 U. S. 22; United States v. Ellsworth, 101 U. S. 170."

"Taxes illegally assessed and paid may always be recovered back, if the collector understands from the payer that the taxes are regarded as illegal and that suit will be instituted to compel the refunding of them." Erskine v. Van Arsdale, 15 Wall. 75, 21 L. Ed. 63.

To the same effect, Neumann v. City of La Crosse, 94 Wis. 103, 68 N. W. 654.

But since the payment was made under protest in the instant case, we need not consider the correctness of the rule stated. In First Nat. Bank v. Watkins, 21 Mich. 483, it is said:

"The payment in this case cannot be regarded as voluntary in any proper sense. It was made under the threat of the immediate and effectual enforcement of the illegal warrant. The authorities are quite uniform that where such a demand is made under color of office and the payment is made under protest, the money may be recovered back, under all circumstances, from the

person extorting it. The only question that appears to have been mooted is whether any protest is necessary, where the entire exaction is illegal on its face. The doctrine is beyond controversy that when the entire claim is unlawful, and the money is taken under the color of public office, an action lies for its recovery. Steele v. Williams, 20 Eng. L. & Eq. 319; 2 Greenl. Ev., sec. 121 and notes; Morgan v. Palmer, 2 B. & C. 729; Story on Agency, sec. 307; Barnes v. Foley, 5 Burr. 2711; Frye v. Lockwood, 4 Cow. 454; Elliott v. Swartwout, 10 Pet. 137; Bend v. Hoyt, 13 Pet. 263."

In Wolfe v. Marshall, 52 Mo. 167, the court adhered to the rule stated in Claflin v. McDonough, 33 Mo. 412, 84 Am. Dec. 54, to the effect that to constitute duress there must be a seizure of the property or arrest of the person, or a threat or attempt to do one or the other.

In Rath v. Chicago, 207 Ill. App. 117, which was an action to recover money paid under protest to prevent prosecution under a void ordinance, the court observed:

"We think Harvey v. Town of Olney, 42 Ill. 336, is controlling of our decision, and while it is true, so far as we have been able to ascertain, that this case has not been cited by the supreme court, yet it has never been modified, distinguished against or reversed by that tribunal in any subsequent case, and it has concededly been cited and followed in several cases in this court. The supreme court in the Harvey case, supra, said that the town of Olney could not 'after extorting a large sum of money for a pretended license by threats of prosecution, be allowed to come into court and resist repayment by saying: "Although we did this thing, we had no right to do it, and the ordinance that we pretended was a law was really no law, and these persons should have known better than to have paid us the money." It is only necessary to say, that the town cannot be permitted to defend its wrong by this species of self-stultification. A person to whom a town offers the alternative of paying for a license, or undergoing a prosecution before the police

magistrate, which would result in fine and imprison-
ment, if the ordinance under which the city acts should
be held valid, may certainly pay his money under pro-
test, without losing his rights, and cannot be required
to incur the hazard of the magistrate's decision upon the
validity of the ordinance, and possibly be driven to a
writ of habeas corpus, to relieve himself from imprison-
ment. Such payment would not be voluntary.' "

In Neumann v. City of La Crosse, supra, it was held
that the payment of a license fee imposed by a void
ordinance, to avoid threatened arrest, was not volun-
tary, and might be recovered.

In Deshong v. City of New York, 176 N. Y. 475, 68
N. E. 880, which was an action to recover money paid to
avoid threatened arrest, it was said:

"Payments coerced by duress or unlawful compulsion
may be recovered back. The coercion, however, must
be illegal, unjust or oppressive. One of the several and
perhaps most common instances of duress is by threats
of actual imprisonment unless the required act shall be
performed. While there may be a diversity of opinion
in some of the reported cases as to what circumstances
are sufficient to constitute such coercion as will enable
a party paying under protest to recover, still, under the
facts of this case we think it is quite apparent that the
amount demanded of the plaintiff was paid under such
circumstances as would enable him to recover, if neither
the city nor its officers had authority to charge or
demand it. If the city made the charge and demanded
its payment without authority of law it was void, and
the action of its officers in enforcing it by threats of
arrest and by taking unlawful possession of the plain-
tiff's property was illegal and payment by him was not
so far voluntary as to prevent a recovery in this action."

From 2 Dillon, Mun. Corp. (4th ed.), sec. 942, we
quote:

"Money paid by a person to prevent an illegal seizure
of his person or property by an officer claiming authority

to seize the same, or paid to liberate his person or property from illegal detention by such officer, may be recovered back in an action for money had and received, on the ground that the payment was compulsory, or by duress or extortion."

"A payment made to relieve the person from arrest or the goods from seizure is a payment on compulsion." 2 Cooley on Taxation (3d ed.) 1505.

See, also, First Nat. Bank v. Sargeant, 65 Neb. 594, 91 N. W. 597, 59 L. R. A. 296; Dist. of Columbia v. Chapman, 25 App. D. C. 95; Burlingame v. Hardin County, 180 Iowa, 919, 164 N. W. 115; Robertson v. Frank Brothers, 132 U. S. 17, 10 Sup. Ct. 5, 33 L. Ed. 236; Magnolia v. Sharman, 46 Ark. 358; Douglas v. Kansas City, 147 Mo. 428, 48 S. W. 851.

The law is clear; and applying it to the facts of the case, as found by the trial court, it is our duty to affirm the judgment.

Such is the order.

SANDERS, C. J., concurring:

I concur in the affirmance of the judgment in this case solely upon the ground that a state, as an incident of the police power, cannot abridge or impair an implied license, growing out of a custom of over a hundred years, namely, that the public lands of the United States, especially those in which the native grasses are adapted to the growth and fattening of domestic animals, shall be free to the people who seek to use them, when left open and uninclosed. Buford v. Houtz, 133 U. S. 320, 10 Sup. Ct. 305, 33 L. Ed. 618; Richards v. Sanderson, 39 Colo. 270, 89 Pac. 769, 121 Am. St. Rep. 167; Clemmons v. Gillette, 33 Mont. 321, 83 Pac. 879, 114 Am. St. Rep. 814; Anthony Wilkinson Live Stock Co. v. McIlquam, 14 Wyo. 209, 83 Pac. 364, 3 L. R. A. (N. S.) 733; Healy v. Smith, 14 Wyo. 263, 83 Pac. 583, 116 Am. St. Rep. 1004.

It is conceded, or must be conceded, that approxi-

mately 90 per cent of the uninclosed lands within the State of Nevada belong to the United States, which lands, from the organization of the state, have been used as a public commons, free to all citizens alike. I am of the opinion that this privilege cannot be monopolized by the state. Neither can the state curtail the privilege by confining it only to those citizens who have their home ranch and livestock headquarters within the State of Nevada, as is required by the first sentence of section 1 of an act approved April 1, 1919, Stats. 1919, p. 389, which provides:

"Section 1. It shall be unlawful for any person or for any corporation who or which does not have his or its principal home ranch and livestock headquarters in the State of Nevada, except as herein provided, to herd or graze, or cause to be herded or grazed, upon any unenclosed lands in the State of Nevada, any sheep or bovine cattle without having first obtained from the sheriff of a county in which such herding or grazing, or some portion thereof is done, a valid license authorizing such herding and grazing in the State of Nevada.  *  *  *"

The practical operation, effect, and result of the particular portion of section 1 above quoted is to make it a penal offense for a citizen of the United States engaged in grazing live stock upon the public domain thereof to have and maintain a place or habitat thereon for sheep and cattle regularly from year to year in the State of Nevada. "Home ranch," as used in the range country, and as employed in the statute, means a home or situs for sheep and cattle that range at large upon the uninclosed lands in the state, or a place where such live stock are gathered and herded and cared for regularly each year. State v. Shaw, 21 Nev. 229, 29 Pac. 321. To maintain such a home or situs for this class of property necessitates the acquirement of some sort of title to the use of public lands of the United States or the State of Nevada. In either case it amounts to an abridgment or impairment of the privilege accorded to all the

people to go upon and use the public range of the United States so long as it is unappropriated and not reserved or set apart for other public purposes.

Conceding that a state may tax private property, such as live stock, located upon public lands of the United States (Utah Power & Light Co. v. United States, 243 U. S. 404, 37 Sup. Ct. 387, 61 L. Ed. 791), and that a state, as an incident to the police power, may limit or regulate the keeping of live stock within the state (Bacon v. Walker, 204 U. S. 311, 27 Sup. Ct. 289, 51 L. Ed. 499), it does not follow that the state may, under the guise of the police power, abridge or impair the privilege of pasture upon the public lands of the United States by requiring as a condition precedent that citizens must have their principal home ranch and livestock headquarters within the state. To countenance such a regulation by a legislative enactment places the use of the public domain for pasturage purposes at the mercy of a state without the consent of Congress.

It is charged that the act is unconstitutional, in that it violates article 4, sec. 2, and invades the fourteenth amendment to the constitution of the United States. It is a well-known rule of courts never to pass upon a constitutional question unless it is clearly involved and a decision thereon is necessary to a determination of a case. State v. Meder, 22 Nev. 264, 38 Pac. 668; State v. Wheeler, 23 Nev. 148, 44 Pac. 430.

The fact that respondent bases his cause of action upon the claim that he is a citizen of Idaho and the law deprives him of his right to graze his live stock equally with all citizens upon the public lands of the United States shows clearly that the case does not involve necessarily a constitutional question for its determination, unless it might be that a state is without power to make rules and regulations respecting the lands of the United States. Article 4, sec. 3, Constitution of the United States.

Entertaining these views as to the purpose and intent of the law, I conclude that as it is framed it is not legitimate legislation, in so far as it covers and includes the open and uninclosed public lands of the United States within the State of Nevada. In arriving at this conclusion I do not wish to be understood as expressing any opinion upon the validity of revenue and license laws now in force relative to foreign live stock within the State of Nevada.